**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 24-159-DLB-CJS**

**DAVID E. SEGRAVES** **PLAINTIFF**

**v.** **MEMORANDUM OPINION AND ORDER**

**CPX BOARDWALK III, LLC** **DEFENDANT**

* * * * * * * * * * * * * * * *

## I. INTRODUCTION

This matter is before the Court on the cross-motions for summary judgment from Plaintiff David E. Segraves (Doc. # 26) and Defendant CPX Boardwalk III, LLC ("CPX") (Doc. # 24). Both Motions have been fully briefed, and the matter is ripe for the Court's review. For the following reasons, Segraves' Motion is **denied** and CPX's Motion is **granted in part**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This dispute stems from a purchase agreement entered into by Segraves and CPX in November of 2022 (the "Purchase Agreement") for Unit 420 of a yet-to-be-constructed development in Newport, Kentucky, for the purchase price of $985,000. When the parties entered into the Purchase Agreement, the Completion Date was left blank. (Doc. # 1-3 at 4, ¶ 7(b)). Approximately six months later, in May of 2023, Segraves and CPX executed an addendum ("Addendum 2") establishing a Completion Date of March 15, 2024. (Doc # 1-4 at 2).

In the Purchase Agreement, CPX retained the right to modify the "Completion Date" under two clauses in Paragraph 7(b): (i) a "force majeure" clause and (ii) a 90-day "for any reason" clause. The force majeure clause specifies that "[t]he Completion Date shall be extended for any delays caused by" among other events, "inability to obtain materials, material supply chain issues, labor shortages…or any occurrences or conditions beyond Seller's reasonable control." (Doc. # 1-3 at 4, ¶ 7(b)). The "for any reason" clause provides that "Seller shall also have the right in its sole discretion, to extend the Completion Date by up to an additional ninety (90) days for any reason." (*Id.*). Further, Paragraph 7(b) establishes a notification process for any Completion Date extensions: "In the event any such occurrences or conditions occur which cause delays in the Completion Date, Seller will advise Buyer of the extended Completion Date prior to the later of the original or previously extended Completion Date." (*Id.*).

In late 2022, Segraves met with CPX representatives to make interior selections for his unit. Under the Purchase Agreement, if a buyer chose to select upgrades for his unit, the buyer "shall deposit with seller the full amount of the cost of the Upgrade specified on the Upgrade Form…simultaneously with the execution of the Upgrade Form." (Doc. # 1-3 at 2, ¶ 3(c)(i)). According to Segraves, during this meeting Amy Kennedy, Director of Residential Sales at Corporex, told him that rolling the costs of the upgrade into his mortgage would not be a problem. (Doc. # 26-4 at 75:5-18). Ms. Kennedy disputes having said this. (Doc. # 26-6 at 77:17-80:6).

In April of 2024, following another meeting with CPX representative Matt Kennedy, Plaintiff chose upgrades for his unit, initialing a form (Doc. # 26-11) specifying his interior

selections, totaling just over $100,000. (Doc. # 6 at 13 ¶ 16; Doc # 24-1 at 4). It is undisputed that Plaintiff did not pay the Upgrade Deposit.

On January 31, 2024, citing construction challenges and project delays, CPX sent Segraves an email purporting to "exercise[ its] extension rights in paragraph 7(b) of the Purchase and Sale Agreement" and stating that it anticipated "delivering the units in June and July." (Doc. # 1-5 at 1). Segraves did not object to or otherwise respond to this email. (Doc. # 23-1 at 132).

Citing delays in securing labor and material shortages, CPX once more extended the estimated Completion Date for Segraves' unit. CPX provided this notice in a May 9, 2024 email, and explained that completion of the units and the subsequent closings would "begin taking place in August, continuing through September and October." (Doc. # 1-6, at 3). The email stated that CPX "will be scheduling individual closings with each of you as we approach the final completion date." (*Id.*). Once again, Plaintiff did not object to or otherwise respond to this email. (Doc. # 23-1 at 134).

Then, on June 21, 2024, Plaintiff sent a "termination notice" to CPX, stating that he "no longer wished to move forward with the sale of the condominium." (Doc. # 1 at 5, ¶ 28). The termination letter stated that the extended Completion Date was "simply not acceptable to Mr. Segraves" and that he had "reservations about whether a closing" was "realistic." (Doc. # 1-8 at 2). In his termination letter, Plaintiff explained that by his interpretation, CPX's January 31 notice of extension was that the March 15, 2024 Completion Date was extended 90 days in accordance with the 90-day "for any reason" clause, and that, once the June 12 extended deadline came and went, he was permitted to exercise his termination rights, which opened for ten days following the missed

Completion Date. (*Id.*). On July 7, 2024, CPX responded to Segraves' termination notice, explaining that they did not accept his termination.

Segraves filed his action in October of 2024 seeking declaratory judgment on several issues: that CPX's rejection of Segraves' termination of the Purchase Agreement is without legal effect (Count I); that CPX explicitly waived the upgrade deposit requirement (Count II); that Segraves had the right to terminate the Purchase Agreement upon the extended completion date (Count III); that Segraves' notice of termination was given timely (Count IV); that CPX had no right to prevent termination by repeatedly extending the completion date (Count V); and that Segraves terminated the Purchase Agreement and is entitled to return of his earnest money deposit, with interest, and attorney's fees (Count VI). In its Answer (Doc. # 6), Defendant filed a Counterclaim seeking a declaratory judgment that Plaintiff breached the Purchase Agreement, that this termination letter was untimely, and that he is not entitled to the return of his deposit (Count I). Defendant also counterclaimed for breach of contract stemming from Plaintiff's failure to pay the Upgrade Deposit (Count II).

While this litigation was pending, Segraves' unit received its certificate of occupancy in February of 2025. (Doc. # 26-2 at 35-36). CPX re-listed Segraves' unit in July 2025 for $1.275 million. (*Id.* at 30-31). CPX then closed on the sale of Unit 420 on June 11, 2026. (Doc. # 26-18).

## III. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56 allows for the granting of summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party or parties bear the burden of showing an absence of a genuine issue of material fact. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586. At this stage, the Court must not weigh evidence or make credibility determinations but instead must ascertain "whether there is a genuine issue for trial." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249). In making this determination, the Court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Further, the Court applies the same standard of review to cross-motions for summary judgment as it does when only one party files. *McKim v. NewMarket Techs., Inc.*, 370 F. App'x 600, 603 (6th Cir. 2010). The Court evaluates each motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration. *Beal ex rel. Putman v. Walgreen Co.*, 408 F. App'x 898, 902 (6th Cir. 2010). The Court

will address each party's Motion for Summary Judgment individually and in turn, beginning with Segraves' Motion.

**B. Segraves' Motion for Summary Judgment**

There are two issues central to this litigation: Plaintiff's breach of the Purchase Agreement by his purported termination of it, and Plaintiff's breach of the Purchase Agreement by his failure to pay the Upgrade Deposit. The court will examine each issue in turn, beginning with Segraves' termination of the Purchase Agreement through his June 21, 2024 email. Under the terms of the Purchase Agreement, Kentucky law governs. (Doc. # 1-3 at 8, ¶ 28).

***1. Validity of Segraves' Purported Termination***

In Count I of his Complaint, Plaintiff seeks declaratory judgment that he effectively terminated the Purchase Agreement, and that CPX's rejection of his termination was without effect. The Purchase Agreement specifies when the Buyer's right to terminate arises and how long it remains. Under paragraph 7(c) of the Purchase Agreement, once the completion date passes without completion of construction, the Buyer must provide written notice to the Seller within ten days, otherwise, the Buyer's right to terminate shall be considered waived. (Doc # 1-3 at 4). To be valid, Plaintiff's termination must have occurred within the ten-day termination window as specified by the contract.

On June 21, 2024, however, the day of Plaintiff's purported termination, he had been in receipt of CPX's May 9, 2024 email stating that closings will "begin taking place in August, continuing through September and October." (Doc. # 1-6, at 2). The email stated that CPX "will be scheduling individual closings with each of you as we approach the final completion date." (*Id.*). Accordingly, the validity of Plaintiff's purported

repudiation depends on whether CPX effectively delayed the completion date before receiving the June 21 termination notice, rendering Plaintiff's termination premature.

**a. Defendant's Right to Repeated Extensions**

Interpretation of contracts is an issue of law for the court. *See Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky. Ct. App.1998). A court must construe clear and unambiguous terms in a contract according to their "plain and ordinary meaning. *K.M.R. v. Foremost Ins. Grp.*, 171 S.W.3d 751, 753 (Ky. Ct. App. 2005).

Plaintiff argues that the Purchase Agreement "does not explicitly say the Completion Date can be extended repeatedly" and that the references to repeated extension are, at best, ambiguous. (Doc. # 26-1 at 36). There are, however, multiple terms in the Purchase Agreement which clearly contemplate the event of repeated completion date modifications. For example, in the "force majeure" clause, the Agreement uses the plural "delays" and "occurrences or conditions." (Doc. # 1-3 at 4, ¶ 7(b)). Additionally, where prescribing Buyer's termination rights, the Purchase Agreement states that "Seller will advise Buyer of the extended Completion Date prior to the later of the original or previously extended Completion Date." (*Id.*). Finally, paragraph 7(c) refers to the Completion Date "as it may be extended" and "as it may be extended from time to time." (*Id.* ¶ 7(c)). If the parties had intended to make the Completion Date extendable only once, there would be no basis for the Completion Date being Extended "from time to time," and the plural forms of paragraph 7 would be surplusage. The Court will not adhere to Plaintiff's reading. *See Price v. Toyota Motor Mfg. Kentucky*, No. 2017-CA-000560-WC, 2017 WL 3498777 (Ky. Ct. App. July 28, 2017) ("no part of the agreement should be construed as meaningless, ineffectual, or rejected as mere surplusage if it serves a

reasonable purpose.”). Because of the clear, repeated references to successively extended Completion Dates in the Agreement, the Court finds that Defendant had the right, under the agreement, to unilaterally extend the Completion Date more than one time.

**b. Date Specificity and Form**

Plaintiff also argues that Defendant’s emails communicating delays were deficient because 1) they failed to “[identify] an extended Completion Date as Paragraph 7(b) itself requires” and 2) “CPX did not specify which extension clause of Paragraph 7(b) it was invoking when exercising its ‘extension rights in paragraph 7(b) of the Purchase and Sale Agreement.’” (Doc. # 26-1 at 23).

Regarding the first point, Plaintiff argues that CPX’s “failure” to include a specific Completion Date in its January 31, 2024 email “made it impossible for Segraves to know when his ten-day window to exercise his termination would open and close” and left the Plaintiff “feeling around in the darkness” to ascertain his deadline. (Doc #26-1 at 26). But CPX did provide its anticipated date *range*, and its intent to provide a specific Completion Date, stating “at this point we anticipate delivering the units in June and July” and “[a]s we get closer to completion, we will be able to give each buyer a specific completion date.” (Doc. # 1-5 at 1). In the parties’ course of transacting, CPX had previously provided an ambiguous Completion Date. When the parties entered into the Purchase Agreement, in November of 2022, the Completion Date was left blank, which lasted until May of 2023 at which point Addendum 2 established a completion date of March 15, 2024. Thus, for six months, from November 2022 to May 2023, the parties maintained the Purchase Agreement without a Completion Date. Though the agreement lacked a

specified Completion Date at this time, parties expected a specific date to be assigned at a later date, once CPX was able to identify a projected Completion Date. This is the same situation the parties found themselves in following the January 31, 2024 email from CPX and again following the May 9, 2024 email, wherein CPX estimated a range of completion dates from August to October, specifying that "we will be scheduling individual closings with each of you as we approach the final completion date." (Doc. # 1-6, at 2).

Paragraph 7(b) of the Purchase Agreement states that "In the event any such occurrences or conditions occur which cause delays in the Completion Date, Seller will advise Buyer of the extended Completion Date prior to the later of the original or previously-extended Completion Date." (Doc. # 1-3, Purchase Agreement ¶ 7(b)). Through its emails, Defendant notified Plaintiff of the Completion Date's extension.

Plaintiff argues that Defendant's extension emails were deficient because the emails "did not specify which extension clause of Paragraph 7(b) it was invoking when exercising its 'extension rights in paragraph 7(b) of the Purchase and Sale Agreement,'" and that this fact left Segraves to guess whether CPX was extending for 90 days under the "extension without cause" provision, or whether the extension was for a specific amount of delay caused by some factor." (Doc. #26-1 at 24). While Defendant did not expressly specify the clause it was invoking, it cited construction delays.

First, in its email of January 31, 2024, Defendant writes that "construction challenges have resulted in project delays and unfortunately has meant we will not achieve our original March 15th target completion date." (Doc. #1-5 at 1). Second, in its email of May 9, 2024, Defendant wrote to Plaintiff that "[w]e have continued to experience construction delays…and the most significant issue has been the difficulty in getting

adequate, qualified manpower on the job….As a result of these delays…we will be exercising our extension rights in paragraph 7(b) of the purchase and sale agreement." (Doc. #1-6 at 2). Thus, in each of its two extension emails, Defendants cited construction delays and labor shortages, consistent with its extension rights as described in the force majeure clause. Accordingly, the Court finds that Segraves' interpretation of the emails, "guessing" that they invoked the 90-day "for any reason" clause, and timing his repudiation accordingly, was an unreasonable interpretation of Defendant's communications.

Courts "are bound to enforce the contract as written by the parties and cannot fashion a different result under the guise of interpretation and construction." *Kentucky Ass'n of Ctys. All Lines Fund Tr. v. McClendon*, 157 S.W.3d 626 (Ky. 2005). Accordingly, this Court finds that Defendant validly exercised its extension rights under the Purchase Agreement's force majeure clause, and that Plaintiff, being in receipt of those extensions, breached the Purchase Agreement with his attempted termination of it. In his Motion for Summary Judgment, Plaintiff argues that, per the Purchase Agreement, Defendant had no right to reject his termination. (Doc. # 26-1 at 17-18). However, the Court finds that Plaintiff's right to termination never arose. The parties intended to give the Plaintiff the right to terminate the agreement under paragraph 7(c), but this right was subject to multiple force majeure extensions, and Defendant validly exercised its extension rights, making Plaintiff's purported termination untimely.

### c. Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing "embraces, among other things, an implied obligation that neither party will do anything to injure or destroy the right of the

other party to receive the benefits of the agreement." *Old Henry Healthcare Real Est., LLC v. Jewish Hosp. & St. Mary's Healthcare, Inc.*, No. 2019-CA-0832-MR, 2021 WL 4343468 (Ky. Ct. App. 2021). "Though a court balks at making a contract for the parties, it will, where justice and expediency demand, infuse the contract with a spirit of good faith and fair dealing in order to justify the implication of a covenant which will prevent one party from impairing the right of the other party to receive the fruits of the contract." *Ligon v. Parr*, 471 S.W.2d 1, 3 (Ky. 1971).

Here, Plaintiff contends that Defendant's repeated extensions without specifying a Completion Date violate the implied covenant of good faith and fair dealing by denying Plaintiff his right to terminate the Purchase Agreement. (Doc. # 26-1 at 25). It is not the lack of a specific date, however, that prevented Plaintiff from exercising his termination rights, but the second notice of May 9, 2024, which extended the "previously-extended Completion Date" and consequently foreclosed Plaintiff's termination rights. As discussed above, Defendant gave valid notice of its force majeure extension. Additionally, Defendant had the right under the Purchase Agreement to unilaterally and repeatedly modify or extend the Completion Date under its force majeure clause. An implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights. *Hunt Enterprises, Inc. v. John Deere Indus. Equipment, Co.*, 162 F.3d 1161, 1998 WL 552795 (6th Cir.1998). Accordingly, this Court finds that Defendant's conduct fails to rise to the level of "arbitrary or unreasonable conduct" a violation of the covenant of good faith and fair dealing entails. (*Id*. at 24, (*citing Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 440-442 (Del.2005))).

For the foregoing reasons, Plaintiff's motion for summary judgment as to Count I, III, IV, and V are **denied**.

**d. Earnest Money Deposit**

Count VI of Segraves' Complaint seeks the return of his Earnest Money Deposit. Under the Purchase Agreement, the "Earnest Money Deposit and Upgrade Deposit…shall be non-refundable for any reason other than as expressly described in this Agreement. (Doc. # 1-3, ¶ 3(d)). Under paragraph 7(c), the Buyer is entitled to a return of the Deposit only following a valid and timely termination. (*Id.*, ¶ 7(c)). Because Plaintiff's termination was not effective, he is not entitled to a return of his Earnest Money Deposit. Accordingly, Plaintiff's Motion for Summary Judgment on Count VI of Plaintiff's Complaint is **denied**.

***2. The Upgrade Deposit***

The second major issue of this litigation stems from the Upgrade Deposit, which is the issue underlying Count II of Plaintiff's Complaint. Under paragraph 3(c)(1), "in the event Buyer elects to add upgraded equipment, materials, or appliances . . . Buyer shall deposit with Seller the full amount of the costs of Upgrades specified on the Upgrade Form . . . simultaneously with the execution of the Upgrade Form." (Doc. # 1-3, ¶ 3(c)(1)). Plaintiff raises two arguments for why he is not bound by these terms.

**a. The Upgrade Form**

First, though Plaintiff chose upgrades to his unit and initialed the corresponding Upgrade Form (Doc. # 23-1, at 84:22–24), he argues that "Upgrade Form" is a specifically defined term, which, under paragraph 6(d) of the Purchase Agreement refers to the form attached as Exhibit D to the Purchase Agreement. Because the "spreadsheet" he initialed

does not conform to Exhibit D of the Purchase Agreement, he argues, his obligation to pay never arose. (Doc. # 26-1 at 18).

But the Purchase Agreement did not require that a subsequent Upgrade Form use the form of Exhibit D or be a replica thereof. The language is clear that "Buyer can only deviate from the Unit Floor Plan or order upgrades "if such changes, additions, or deviations are set forth in a written upgrade form ('Upgrade Form') signed by both Buyer and Seller in *substantially the same form* of Exhibit 'D' attached hereto and incorporated by reference herein." (Doc. # 1-3, ¶ 6(d) (emphasis added)). The Purchase Agreement also provides that "[t]he Upgrade Form shall set forth the agreed amount of the Upgrade Deposit, and shall credit any cost savings realized by the elimination of items from the Basic Condominium Unit, if applicable." (*Id.*). The form executed and initialed by Plaintiff includes this information. It details the upgrades Plaintiff selected, their total of $106,972, "credits" $6,000 of "cost savings realized by the elimination of items from the Basic Condominium Unit," and establishes the amount of the Upgrade Deposit as $100,972. (Doc. # 24-8, at 5). While the upgrade "spreadsheet" that was executed may not appear visually similar to the upgrade form attached as Exhibit D to the Purchase Agreement, it contains the necessary information as required under the Agreement, making it "substantially" the form of the Exhibit D Upgrade Form.

The executed "spreadsheet" Upgrade Form bears the Plaintiff's initials, but is not signed by Defendants, as paragraph 6(d) requires. Plaintiff argues that CPX's failure to sign means he was never obligated to pay for the upgrades he initialed for. The Court disagrees. "Kentucky law recognizes that parties may be bound by the terms of an unsigned contract when their actions demonstrate assent to the agreement." *E.L. Burns*

*Co. v. David Eng'g & Const., Inc.,* No. 2007-CA-000793-MR, 2008 WL 2388414 (Ky. Ct. App. June 13, 2008). Kentucky's highest court held that "[a]n express agreement may be proved by direct evidence, or circumstantial evidence, or both." *George Pridemore & Son, Inc. v. Traylor Bros., Inc.*, 311 S.W.2d 396, 397 (Ky. 1958). The Kentucky Supreme Court further noted that a party who undertakes to perform work on the basis of a "purchase order" is presumed to have taken notice of and assented to its terms. *Id.* Here, CPX accepted Plaintiff's upgrade requests and began its obligations to customize the unit as specified. (Doc. # 31 at 13). Further, Plaintiff was aware that CPX employees were attempting to collect payment, or, according to him, roll the upgrade cost into his mortgage, evincing their acceptance of the upgrades. (Doc. # 24-3, at 114:13–2).

**b. Waiver and Agency**

Next, Plaintiff argues that even if the "spreadsheet" Upgrade Form did bind him, CPX waived the payment requirements through its agents, Amy Kennedy and Matt Kennedy, who "did not take a hard line with Segraves on payment." (Doc. # 26 at 19). Defendant argues that any reliance on Amy Kennedy's statements is unjustified and precluded by paragraph 30(a) of the Purchase Agreement, which contains a merger clause. But this clause refers to "all prior and contemporaneous understandings and agreements" not subsequent agreements that Plaintiff alleges to have formed with Ms. Kennedy. (Doc. # 24-1, ¶ 30(c)). Further, paragraph 30(c) provides that "[no amendment to this Agreement shall be effective unless in writing and executed by both parties hereto." (Doc. # 24-1, ¶ 30(c). Unlike the merger clause of paragraph 30(a), paragraph 30(c)'s reference to "amendment[s]" is prospective, and, accordingly, controls all subsequent conduct after parties entered the Purchase Agreement.

What's more, beyond the terms of the Purchase Agreement itself, Plaintiff's waiver argument runs into trouble with the statute of frauds, which requires all contracts, and amendments thereto, relating to real estate "be in writing and signed by the party to be charged therewith, or by his authorized agent." *Miller v. Hutson*, 281 S.W.3d 791 (Ky. 2009) (citing KRS 371.010(9)). A buy/sell agreement of real estate is a contract for the sale of real estate. *Smith v. Williams*, 396 S.W.3d 296 (Ky. 2012). The Kentucky Supreme Court has held that any modification materially altering the terms of a contract covered under the statute of frauds must also comply with the statute of frauds and, thus, must be in writing. *Farmers Bank & Trust Co. of Georgetown v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 8 (Ky.2005). Under paragraph 15 of the Purchase Agreement, time is of the essence with respect to payment under the contract. (Doc. #1-3 ¶15). This makes timing of payment a material condition. *See Id*. at 8-9 (explaining that where time is expressly made of the essence in a contract for performing a given act, the time allowed by contract for performance is an essential element and any alteration of it is a material change).

Even looking past the clear language of paragraph 30(c), under a summary judgment standard, the movant must demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations

must be left to the factfinder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

The evidence that Plaintiff presents to support his claim of waiver is disputed. Plaintiff alleges that Amy Kennedy told him that rolling the cost of the Upgrade Deposit into his mortgage would be no problem. (Doc. # 26-1 at 7; Doc. # 26-4 at 75:9 – 78:1). For her part, Ms. Kennedy denies having ever made such statements to Plaintiff. (Doc. # 24-9, at 118:6–19). As written evidence, Plaintiff alleges that Ms. Kennedy "admitted in an email sent on July 2, 2024 that through the April 2024 meeting between Segraves and Matt Kennedy, it was her understanding that buyers financing their purchase could 'roll the cost of upgrades into their mortgages.'" As Ms. Kennedy testified, however, that statement reflected her prior experience with other regional builders, not CPX. (Doc. # 23-3, at 73:1–25, 74:2 20). The final line of Ms. Kennedy's email states: "However our contract states it different, they have to pay for upgrades." (Doc. # 27-8).

Second, Plaintiff alleges that Matt Kennedy "did not take a hard line with Segraves on payment; he expressed a willingness to work with Segraves on timing, just as he did with other buyers." (Doc. #26-1 at 19). Under Kentucky law, "[w]aiver requires proof of a knowing and voluntary surrender or relinquishment of a known right." *Moore v. Asente*, 110 S.W.3d 336, 360 (Ky. 2003) (quotations omitted). Plaintiff also points to Defendant's lenience on his earlier payments to support his claim that "CPX was flexible with buyers about the timing of payment." (*Id.*). Yet lenience, or failure to bring a breach of contract action, falls well short of a knowing and voluntary abandonment of one's contract rights. As Plaintiff admitted in his deposition, he "received multiple calls" from Matt Kennedy

"seeking payment for upgrades" but never responded. (Doc. #24-3, Ex. C to Def's MSJ, Segraves Depo. at 112:9–113:21).

Despite these purported conflicting statements, paragraph 30(c) of the Purchase Agreement and the statute of frauds precludes an oral modification to the payment requirements. As a result, Plaintiff's motion for summary judgment Count II is **denied**.

### ***3. CPX's Counterclaim for Breach of Contract***

Plaintiff argues that Defendant's Counterclaim must fail because it cannot show proof of loss of bargain damages. In *Lawson v. Menefee*, the Kentucky Court of Appeals distinguished between what it termed "loss of the bargain" damages and consequential damages. 132 S.W.3d 890, 893 (Ky. Ct. App. 2004). Loss of the bargain "consists of any deficiency in the actual value compared to the contract price. Conversely, if the actual value exceeds the contract price, there is no loss of the bargain caused by the breach." *Id.*

CPX closed on Unit 420 on June 11, 2026 for $1.275 million, paying closing costs and a real estate commission of $38,250, meaning it received net proceeds of $1,226,816. Had Segraves closed on his unit, CPX would have received the unit price of $985,000 plus $100,972 in upgrades selected by Segraves, for total of $1,085,972, minus hypothetical closing costs, for a final sum Plaintiff accounts as $1,053,392, alleging "CPX came out well ahead on the sale of Unit 420 – to the tune of $173,424.25." (Doc. # 26-1 at 30).

Moreover, Plaintiff argues that CPX "waived all claims for consequential and incidental damages in Paragraph 17(b) of the Purchase Agreement." (Doc. # 26-1 at 31). The relevant clause reads: "Buyer and seller waive, release, and covenant not to assert

any right or claim to consequential, incidental, treble (or other multiplier), or punitive damages." (Doc. # 1-3 ¶ 17(b)). Under Kentucky law, "recovery of consequential damages may be offset or credited against any profit realized on the resale of the property following a breach." *Lawson*, 132 S.W.3d at 894. Thus, any consequential damages the court deems viable are reduced by the gain in value realized by the subsequent sale of Unit 420.

CPX seeks payment of the Upgrade Deposit, retention of Plaintiff's Earnest Money Deposit and any interest accrued thereon, and "'actual damages necessary to compensate' CPX or otherwise provided for under the Purchase Agreement, including, but not limited to, reimbursement for carrying costs incurred by CPX as a direct result of Plaintiff's failure to close and make his required payments, and in furtherance of CPX's duty to maintain Unit 420." (Doc. # 26-2 at 164:15–19, 166:13–168:20).[1]

Rather than produce a balance sheet of costs at the summary judgment stage, Defendant asks this Court to schedule a damages hearing. Plaintiff argues that the lack of proof of damages forecloses Defendant's Counterclaim. (Doc. # 26-1 at 36). But this overlooks the possibility of nominal damages. To support its Counterclaim, Defendant must establish the existence of a contract, its breach, and damages flowing from the breach. *See Brown & Brown of Ky., Inc. v. Walker*, 652 S.W.3d 624, 631 (Ky. App. 2022) (citation omitted)). "Generally, in instances where a litigant establishes a cause of action

---

[1] As a matter of law, CPX is not entitled to the "penalty interest" (15% on the total purchase price) pursuant to Paragraph 10(a) of the Purchase Agreement. (Doc. # 26-2 CPX depo. (Heekin) at 166:18 – 166:25). The relevant section states, "If Buyer requests and the parties agree to a Closing Date that is later than fifteen (15) days following the date of Seller's notice to Buyer as described in this Section 11(a) [sic], Buyer will pay interest on the Purchase Price at the rate of fifteen percent (15%) per annum, commencing on such fifteenth day following the date of such notice." This provision clearly contemplates an agreed-to closing date, not a breach.

but has not established an entitlement to compensatory damages, nominal damages may be awarded." *Mo–Jack Distrib., LLC v. Tamarak Snacks, LLC*, 476 S.W.3d 900, 907 (Ky. Ct. App. 2015). Accordingly, even if Defendant's damages (both loss of the bargain and consequential) are offset by the financial gain it made in its resale of Unit 420, Plaintiff is not entitled to summary judgment as a matter of law, as Defendant may be entitled to nominal damages.

**C. Defendant's Motion for Summary Judgment**

The Court now turns to Defendant's Motion for Summary Judgment (Doc. # 24), first addressing Plaintiff's termination and breach of the Purchase Agreement and then turning to Plaintiff's failure to pay his Upgrade Deposit.

***1. Validity of Segraves' Purported Termination***

In Count I of his Complaint, Plaintiff seeks declaratory judgment that Plaintiff effectively terminated the Purchase Agreement, and that CPX's rejection of it was without effect. In Count I of its Counterclaim, Defendant seeks declaratory judgment that Plaintiff's purported termination was untimely and without effect, and that Plaintiff is not entitled to the return of his earnest money deposit. As noted above, interpretation of a contract is an issue of law for the court. *See Cinelli*, 997 S.W.2d 474 (Ky. Ct. App.1998).

In the interest of brevity this Court incorporates its previous discussion of the termination rights afforded to the Buyer under paragraph 7(c). *See infra*, section III.B.1. In short, the Purchase Agreement affords the Buyer the right to terminate the Purchase Agreement once the completion date passes without completion of construction, and this right remains open for ten days. (Doc # 1-3 at 4). The Court faces two issues in determining if Plaintiff rightly exercised his termination rights: whether the Agreement

allowed multiple extensions, and whether Defendant's failure to provide a specific day as a Completion Date rendered its extension invalid.

**a. Repeated Extensions**

Plaintiff argues that the Purchase Agreement "does not explicitly say the Completion Date can be extended repeatedly" and that the references to repeated extension are, at best, ambiguous. (Doc. # 26-1 at 36). There are multiple terms in the Purchase Agreement which clearly contemplate the event of repeated completion date modifications. In the "force majeure" clause, the Agreement references the plural "delays" and "occurrences or conditions." (Doc. # 1-3 at 4, ¶ 7(b)). Where describing Buyer's termination rights, the Agreement states that "Seller will advise Buyer of the extended Completion Date prior to the later of the original or previously extended Completion Date." (*Id.*). Finally, paragraph 7(c) refers to the Completion Date "as it may be extended" and "as it may be extended from time to time." (*Id.* ¶ 7(c)). Defendant argues that "if only a single extension was permitted, there would be no references to a "previously-extended" Completion Date, no basis for the Completion Date to be "extended from time to time," and the use of plural forms throughout Paragraph 7 would make no sense. The Court agrees.

**b. Date Specificity and Form**

Plaintiff also argues that Defendant's email delays were deficient because 1) they failed to "[identify] an extended Completion Date as Paragraph 7(b) itself requires" and 2) "CPX did not specify which extension clause of Paragraph 7(b) it was invoking when exercising its 'extension rights in paragraph 7(b) of the Purchase and Sale Agreement.'" (Doc. # 26-1 at 23).

Regarding the first point, Plaintiff argues that CPX's "failure" to include a specific Completion Date in its January 31, 2024 email "made it impossible for Segraves to know when his ten-day window to exercise his termination would open and close" and left the Plaintiff "feeling around in the darkness" to ascertain his end date. (Doc #26-1 at 26). But CPX did provide its anticipated date *range*, and the intent to provide a specific Completion Date, stating "at this point we anticipate delivering the units in June and July" and "[a]s we get closer to completion, we will be able to give each buyer a specific completion date." (Doc. # 1-5 at 1). In parties' course of transacting, absence of a specific Completion Date had occurred before. When parties entered into the Purchase Agreement, in November of 2022, the Completion Date was left blank, which lasted until May of 2023 at which point Addendum 2 established a completion date of March 15, 2024. Thus, for six months, from November 2022 to May 2023, the parties maintained their agreement. Though the Purchase Agreement lacked a specified Completion Date at this time, the parties expected a specific date to be assigned once CPX identified a projected Completion Date. This is the same situation parties found themselves in following the January 31, 2024 email from CPX and again following the May 9, 2024 email, wherein CPX estimated a range of completion dates from August to October, specifying that "we will be scheduling individual closings with each of you as we approach the final completion date." (Doc. # 1-6, at 2).[2]

---

2 As Defendant observes, Plaintiff's logic is self-defeating on this point. CPX argues that "if failure to provide a "specific" Completion Date renders an extension ineffective, as Plaintiff claims, then the original March 15 Completion Date would control and Plaintiff's "termination notice" was three months too late. Only the Addendum's March 15 Completion Date had the specificity Plaintiff claims was required by the Purchase Agreement." (Doc. # 24 at 15-16 (citing Doc. # 1, ¶¶ 50–61)). Because of this, Plaintiff reads in a Completion Date of June 13, 2024, 90 days after the March 15, 2024 Completion Date. (Doc. # 26-1 at 26). But this date was not ever

Additionally, Plaintiff argues that Defendant's extension emails were deficient because the emails "did not specify which extension clause of Paragraph 7(b) it was invoking when exercising its 'extension rights in paragraph 7(b) of the Purchase and Sale Agreement,'" and that this fact left Segraves to guess whether CPX was extending for 90 days under the "extension without cause" provision, or whether the extension was for a specific amount of delay caused by some factor." (Doc. #26-1 at 24). While neither of the extension emails specifically describe which of the two extension clauses they invoke under paragraph 7(b), they each cite construction delays. First, in its email of January 31, 2024, Defendant writes that "construction challenges have resulted in project delays and unfortunately has meant we will not achieve our original March 15th target completion date." (Doc. #1-5 at 1). Second, in its email of May 9, 2024, Defendant wrote to Plaintiff that "[w]e have continued to experience construction delays…and the most significant issue has been the difficulty in getting adequate, qualified manpower on the job . . . As a result of these delays . . . we will be exercising our extension rights in paragraph 7 (b) of the purchase and sale agreement." (Doc. #1-6 at 2). In possession of these emails, Plaintiff did not act reasonably by treating the first one as a 90-day "for any reason" extension, and completely ignoring the second one, which he received before sending his own termination.

Courts "are bound to enforce the contract as written by the parties and cannot fashion a different result under the guise of interpretation and construction." *NS Group, Inc. v. CPX RiverCenter Ltd. P'Ship*, No. 2010-CA-002055-MR, 2012 WL 330813, at *3

communicated between the parties. Plaintiff set it himself after assuming the extension was under the "for any reason" clause, an assumption the court considers erroneous.

(Ky. Ct. App. Feb. 3, 2012) (citing *Kentucky Ass'n of Cntys. All Lines Fund Tr. v. McClendon*, 157 S.W.3d 626, 633 (Ky. 2005)). Accordingly, this Court finds that Defendant validly exercised its extension rights under the Purchase Agreement's force majeure clause, and Plaintiff, being in receipt of those extensions, breached the Purchase Agreement by attempting to terminate.

In his Motion for Summary Judgment, Plaintiff argues that, under the Purchase Agreement, Defendant had no right to reject his termination. (Doc. #26-1 at 17-18). However, as discussed above, Plaintiff's right to termination never arose. The parties intended to give the Plaintiff the right to terminate the agreement under paragraph 7(c), but this right was subject to multiple force majeure extensions, and Defendant validly exercised its extension rights, making Plaintiff's purported termination untimely and ineffective.

**c. Illusory Contract**

In his Complaint, Plaintiff alleges that Defendant's right to repeatedly extend the Purchase Agreement rendered his limited right to terminate illusory. (Doc. # 1 at 18). The Court disagrees. Plaintiff's right to terminate was subject to repeated force majeure extensions, caused by factors contemplated by the Agreement and beyond Defendant's control, but this does not make it illusory. Plaintiff's right could have arisen had CPX failed to achieve completion of construction by the Completion Date or exhausted the single "for any reason" 90-day extension. Plaintiff's termination rights were limited, but not illusory.

**d. Good Faith and Fair Dealing**

In the interest of brevity, the Court similarly incorporates its discussion of the implied covenant of good faith and fair dealing contained in section III.B.1.iii. Defendant

did not violate an implied covenant of good faith and fair dealing when extending the Completion Date.

For the foregoing reasons, Defendant's Motion for Summary Judgment is **granted** as to Counts I, III, IV, and V of Segraves' Complaint.

**e. Earnest Money Deposit**

Count VI of Segraves' Complaint seeks the return of his Earnest Money Deposit. Under the Purchase Agreement, the "Earnest Money Deposit and Upgrade Deposit . . . shall be non-refundable for any reason other than as expressly described in this Agreement." (Doc. # 1-3 ¶ 3(d)). Under paragraph 7(c), the Buyer is entitled to a return of the Deposit only following a valid and timely termination. (Id. ¶ 7(c)). Because Plaintiff's termination was neither valid nor timely, he is not entitled to a return of his Earnest Money Deposit. Accordingly, Defendant's Motion for Summary Judgment on Count VI of Plaintiff's Complaint is **granted**.

***2. The Upgrade Deposit***

Under the terms of the Purchase Agreement, "in the event Buyer elects to add upgraded equipment, materials, or appliances . . . Buyer shall deposit with Seller the full amount of the costs of Upgrades specified on the Upgrade Form . . . simultaneously with the execution of the Upgrade Form." (Doc. # 1-3 at ¶ 3(c)(1)). Plaintiff seeks a declaratory judgment that he was not obligated to pay this deposit (Complaint, Count II) and Defendant makes Plaintiff's failure the pay the basis of its breach of contract claim (Counterclaim, Count II).

**a. The Upgrade Form**

The Court incorporates its analysis from section III.B.2.a above, finding that the Upgrade Form signed by Plaintiff was, by virtue of containing the essential terms of the upgrade selections, the cost, and the "credits" of cost savings, "in substantially the same form" of Exhibit D of the Purchase Agreement. Accordingly, Plaintiff's obligation pay took effect at signing.

**b. Waiver**

The court incorporates its analysis from section III.B.2.a above, finding that oral modification of the Purchase Agreement is precluded by paragraph 30 of the Agreement and the statute of frauds. *See Farmers Bank & Trust Co. of Georgetown*, 171 S.W.3d at 8-9 (Ky.2005) (explaining that where time is expressly made of the essence in a contract for performing a given act, the time allowed by contract for performance is an essential element and any alteration of it is a material change).

Accordingly, because Plaintiff was obligated to pay the Upgrade Deposit and there was no written waiver, Defendant's Motion for Summary Judgment as to Count II of Plaintiff's Complaint seeking declaratory judgment is **granted**.

**c. Defendant's Damages**

A breach of contract claim requires proof of three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract. *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009). Defendant has demonstrated the existence of a contract for the unit upgrades and Plaintiff's legal breach of that contract, but has not proven the third element of damages. Accordingly, Defendant is entitled to partial summary judgment on his Counterclaim Count II, regarding duty and

breach, but not damages. The court will enter an Order setting a separate damages hearing during which CPX must demonstrate its entitlement to money damages on its counterclaim.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that:

(1) Plaintiff's Motion for Summary Judgment (Doc. # 26) is **DENIED**;

(2) Defendant's Motion for Summary Judgment (Doc. # 24) is **GRANTED IN PART**;

(3) Plaintiff's Complaint (Doc. # 1) is **DISMISSED with prejudice**; and

(4) A damages hearing on Defendant's counterclaim shall be set by subsequent Order.

This 23rd day of November, 2026.

**Signed By:**

***David L. Bunning*** DB

**Chief United States District Judge**